<p style="text-align:center;color:red;">CORRECTED COPY</p>

# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 17-2054V**
**Filed: August 2, 2019**
PUBLISHED

| | |
|---|---|
| LUCINDA KELLEY,<br><br>                       Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>              Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA,* for petitioner.
*Amy Paula Kokot, U.S. Department of Justice, Washington, DC,* for respondent.

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On December 28, 2017, Lucinda Kelley ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa–10, *et seq.*[2] (the "Vaccine Act" or "Program"), alleging that as a result of receiving an influenza ("flu") vaccination on November 7, 2016, she suffered a shoulder injury related to vaccine administration ("SIRVA") to her left shoulder. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. For the reasons discussed below, the undersigned now finds that petitioner is entitled to compensation in the amount of $124,289.05.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.     Procedural History

Ms. Kelley filed her petition for compensation on December 28, 2017. (ECF No. 1).   On February 15, 2019, respondent filed his report pursuant to Vaccine Rule 4(c) conceding that petitioner's injury constituted a SIRVA Table injury and recommending that appropriate damages be awarded.  (ECF No. 23).  The undersigned issued a ruling on entitlement on February 15, 2019 finding petitioner entitled to compensation for SIRVA.  (ECF No. 24).

A status conference was held on May 10, 2019.  The parties stated that they had reached an impasse regarding damages and agreed to submit to a decision by the undersigned awarding damages based on the written record.  The undersigned ordered the parties to file a joint status report indicating the stipulated amount of petitioner's unreimbursable expenses.  The undersigned further ordered each party to file simultaneous briefs in support of their respective positions on the appropriate amount of compensation.  (ECF No. 30).

On June 6, 2019, the parties stipulated that petitioner's out-of-pocket expenses totaled $4,289.05.  (ECF No. 32).  On June 10, 2019 the parties each filed briefs addressing damages for pain and suffering.  (ECF Nos. 34, 37).  Accordingly, this case is now ripe for an adjudication of petitioner's damages.

## II.     Relevant Factual History

Ms. Kelley received a flu vaccine on November 7, 2016, in her left deltoid. Petitioner's Exhibit ("Ex.") 2.  Petitioner's prior medical history does not include any mention of shoulder problems and is not otherwise relevant to her claim.

In her declaration, Ms. Kelley stated that she noticed that the vaccine was administered higher up on her shoulder than previous vaccines. Ex. 1 at 1.  Ms. Kelley stated that she experienced some initial pain after the vaccine was administered that significantly worsened after a few days.  *Id.*  She stated she was brought to tears when lifting her left arm upwards and any sudden movement increased the pain.  *Id.*  Ms. Kelley described that she could not get dressed or undressed and was unable to pull the covers on her bed without pain.  *Id.*

Ms. Kelley first sought treatment for her shoulder injury on November 30, 2016, with Brandon Mines, M.D., an orthopedic specialist.  She reported that her shoulder pain began after receiving a flu shot three weeks prior. Ex. 3 at 1.  She reported the injection "seemed high" and was more painful than usual.  *Id.*  Ms. Kelly described her pain as a "sharp, pulling" type pain which was increasing and any arm movement exacerbated the pain.  *Id.*  Ms. Kelley rated it as 8 out of 10 on a scale from 1 to 10.  *Id.*

On examination, Dr. Mines found Ms. Kelley to have limitations in the range of motion ("ROM") of her left shoulder with mild to moderate pain. Ex. 3 at 3.  The results from an x-ray of the left shoulder were normal and Dr. Mines diagnosed petitioner with tendonitis of left rotator cuff.  *Id.* at 4.  He administered a cortisone shot to Ms. Kelley's left shoulder and prescribed physical therapy and diclofenac for pain.  *Id.*  Dr. Mines encouraged Ms. Kelley to ice her shoulder and to take over-the-counter non-steroidal anti-inflammatory drugs for pain and to reduce inflammation.  *Id.*

Ms. Kelley attended her first physical therapy ("PT") visit on December 6, 2016. Ex. 4 at 10.  She reported that her pain had improved after she received the cortisone injection on November 30, 2016, but stated that her pain was beginning to return.  Ms. Kelley rated her pain at 9/10 before she received the cortisone injection and a 2/10 after the injection, with most of her pain occurring when she was reaching.  *Id.*  Petitioner attended seven PT sessions in total.  By her last session, Ms. Kelley reported only minimal discomfort at night.  *Id.* at 10-18.  She was discharged from PT on January 27, 2017 with full ROM of her left shoulder and minimal symptoms.  *Id.* at 18.

Ms. Kelley returned to Dr. Mines on January 11, 2017 reporting that she was still experiencing pain at night.  Dr. Mines changed Ms. Kelley's medication to meloxicam because the diclofenac was not helping. Ex. 3 at 5-7.

On February 24, 2017, Ms. Kelley underwent an MRI of her left shoulder.  Ex. 3 at 8.  The MRI showed a small focal near full-thickness tear of the infraspinatus with a small interstitial delaminating tear extension along the myotendinous junction.  The MRI also showed supraspinatus tendinosis without high-grade partial or full thickness tears, and a Type III acromion with a small subacromial spur.  There was some small subacromial/subdeltoid bursitis, but a preserved rotator cuff muscle bulk.  *Id.* at 8-9.

On March 21, 2017, Ms. Kelley sought further treatment from Spero Karas, M.D., an orthopedic surgeon at the Sports Medicine Clinic.  Ex. 3 at 10.  Dr. Karas noted that Ms. Kelley reported a five-month history of left lateral shoulder pain that was worse with overhead activities and at night.  *Id.*  According to petitioner, the cortisone injection and PT both significantly improved her pain for one month, but the pain eventually returned to its previous level.  *Id.*  Dr. Karas noted that Ms. Kelley occasionally took ibuprofen for her pain which offered some relief.  *Id.*  On examination, Dr. Karas noted moderate tenderness to palpation of Ms. Kelley's left shoulder and a limited ROM with mild to moderate pain reported.  *Id.* at 12.  Dr. Karas also noted that petitioner's left shoulder pain persisted and was not responding to conservative measures.  *Id.* at 13.  He diagnosed her with AC arthritis, Type III acromion, rotator cuff tendinosis vs. partial tearing, and biceps tendonitis.  Dr. Karas discussed operative options with Ms. Kelley including possible rotator cuff debridement and/or repair.  *Id.*  Ms. Kelley was to call back if and when she elected to pursue surgery.  *Id.*

On May 24, 2017, Ms. Kelley underwent arthroscopic shoulder surgery, including a subacromial decompression, distal clavicle excision, and biceps tenotomy.  Ex. 5 at 1-4.  It was noted that Ms. Kelly had a biceps tendon tear that was released during the surgery to prevent further pain and mechanical symptoms.  *Id.* at 5-6.  Also discovered during the surgery was a large subacromial spur and hypertrophic bursa that was removed to decrease symptoms of impingement.  The AC joint was also removed to alleviate pain and for degeneration of the joint.  Ms. Kelley was discharged with Percocet for pain and promethazine to prevent nausea and vomiting.  *Id.* at 24.

Petitioner returned to Dr. Karas for a post-operative visit on May 26, 2017.  Ex. 3 at 29.  Ms. Kelley reported that she was still experiencing moderate discomfort with certain movements even though she was taking the pain medication as prescribed.  Ms. Kelley rated her pain at 3/10.  *Id.*  Dr. Karas prescribed physical therapy and a home exercise program.  *Id.* at 31.

Ms. Kelley began her post-operative PT on May 31, 2017. Ex. 4 at 19. At this initial session, she complained of a feeling of tightness in her left shoulder with her current pain level rated at 1/10 and at 3/10 at its worst. *Id.* Ms. Kelley stated that her goal was to be able to carry her new baby granddaughter in four weeks. *Id*. The physical therapist noted limitations in Ms. Kelley's ROM, strength, and overall functional capacity of the left shoulder. *Id*. Ms. Kelley continued with PT until June 6, 2018, at which time she rated her pain at 0/10. *Id*. at 23.

On June 13, 2017, Ms. Kelley returned to Dr. Karas's office for another post-operative evaluation where she rated her current pain at 1/10. Ex. 3 at 44. It was recommended that Ms. Kelley continue with formal PT for eight more weeks. *Id*. at 46.

Ms. Kelley continued with her PT sessions, occasionally reporting pain at 1/10 at its worst. She continued to demonstrate limitations of the ROM, strength, and overall functional capacity of her left shoulder. Ex. 4 at 29-40. During a July 10, 2017 PT session, Ms. Kelley reported left upper extremity discomfort after walking her dogs. *Id*. at 41. At her July 26, 2017 session, Ms. Kelley reported only minimal discomfort in her posterior left shoulder and felt this her only remaining impairment. *Id*. at 47. However, on August 3, 2017, Ms. Kelley again began reporting pain to the front of her left shoulder when reaching across her chest. *Id*. at 51.

On August 8, 2017, approximately ten weeks after Ms. Kelley's shoulder surgery, Dr. Karas evaluated petitioner's progress. Dr. Karas noted that Ms. Kelley was doing well with physical therapy and her pain was improving. Dr. Karas prescribed Ms. Kelley additional PT for Ms. Kelley to continue strengthening her rotator cuff muscles and she was to return in two months for a routine follow-up. Ex. 3 at 59.

Ms. Kelley continued attending PT, occasionally reporting moderate pain to the front of her left shoulder when reaching across her chest. Ex. 4 at 53. The PT records indicated that she met her goal of reporting negative pain with carrying a baby as of August 10, 2017. *Id*. at 55. However, on August 29, 2017, Ms. Kelley was still reporting minimal left anterior shoulder pain which she attributed to holding her granddaughter for prolonged periods over the weekend. *Id*. at 60.

During her September 5, 2017 PT session, Ms. Kelley reported continued discomfort with reaching across her body, which waxed and waned during the previous month. *Id*. at 64-71. By October 2, 2017, she described occasional popping in her left shoulder but stated her pain "isn't too bad." *Id*. at 72. The physical therapist wrote in the assessment that Ms. Kelley had made great progress with both the ROM and strength of her left shoulder. *Id*. at 73. She also noted that Ms. Kelley was still moderately limited with her strength which appeared to be contributing to the "popping" sensation in her left shoulder. *Id*. Ms. Kelley reported pain with higher level activities and the therapist recommended that Ms. Kelley continue with skilled PT to focus on strengthening her shoulder and decreasing her pain. *Id*.

Ms. Kelley presented to the Sports Medicine Clinic on October 3, 2017 and was evaluated by Robert Bowers, D.O. Ex. 3 at 71. Dr. Bowers noted that Ms. Kelley was still experiencing some occasional discomfort over the anterior portion of her left shoulder and reported that her shoulder continued to feel somewhat weak, but her ROM had improved since her last visit and had significantly improved since surgery. Ex. 3 at

71.   Dr. Bowers recommended that Ms. Kelley continue with PT to work on strengthening her left shoulder and instructed her to follow-up as needed. *Id.* at 72.

Ms. Kelley continued with PT until she was discharged on December 13, 2017. The physical therapist noted the following in the discharge assessment:

> Since her L shoulder arthroscopy, Lucinda has made great gains in ROM, strength, and pain control of the L shoulder.  She has full ROM of the L shoulder as compared to the R shoulder and her strength is well within normal limits.   She continues to [have] posterior cuff and postural stabilization deficits which appear to be contributing to her [symptoms] consistent with ACJ impingement after heavier lifting activities.   She demonstrates upper trap compensation as the L shoulder begins to fatigue and this is likely leading to increased elevation of humeral head and, therefore, impingement.  Pt. has been provided with an HEP to address continued decreased endurance of the L RTC and postural stabilization musculature.  She has met all goals and is appropriate for [discharge] from skilled PT at this time with instructions to contact us with any questions or concerns.

Ex. 8 at 2.

### III.   Party Contentions

Petitioner seeks an award in the amount of $134,289.05, consisting of $130,000.00 as compensation for her pain and suffering, and $4,289.05 for past unreimbursable medical expenses.  Petitioner's Brief in Support of Damages at 17, ("Pet Brief", ECF No. 37).  In her brief, petitioner emphasizes that she suffered and sought active treatment for 13 months, including a cortisone shot, shoulder surgery, and many sessions of physical therapy. *Id.*  Petitioner also claims the injury impacted her activities of daily living and her role as a grandmother. *Id.*  Petitioner is not making a claim for lost wages.

Respondent agreed to the $4,289.05 in unreimbursable medical expenses and the parties memorialized the agreement in a joint status report.  Joint Status Report (ECF No. 32).  Respondent argues that petitioner should be awarded $85,000.00 as compensation for her actual pain and suffering.  Respondent's Memorandum Regarding Damages at 1, ("Res. Mem.", ECF No. 34).  He maintains the medical records demonstrate that petitioner's SIRVA resolved within approximately one year. *Id.* at 4. He argues that petitioner's shoulder surgery was successful, and her pain improved significantly so that she did not require additional treatment once PT concluded. *Id.*

### IV.   Discussion and Analysis

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks

compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).  Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on his daily life.  *Shapiro v. Sec'y Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).  In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and the parties' briefs.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case.  *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[3]  *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, it must be stressed that pain and suffering is not determined based on a continuum.  *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, the Court rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  The Court noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590.  Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id*. at 595.

## A.  History of SIRVA Settlement and Proffer

SIRVA cases have an extensive history of informal resolution within the SPU.  As of January 1, 2019, 1,023 SIRVA cases have informally resolved[4] within the Special Processing Unit since its inception in July of 2014.[5]  Of those cases, 602 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[6]  Additionally, 395 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $77,000.00 to $125,000.00.[7]  The median award is $100,000.00.  In most instances, these awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[8]  The median award is $70,000.00.  As with proffered cases, in most instances, stipulated awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.  Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B.  Prior Decisions Addressing SIRVA Damages

---

[4] Additionally, 31 claims alleging SIRVA have been dismissed within the SPU.

[5] In *Kim*, *infra*, and *Young, infra*, the undersigned previously described SPU SIRVA case resolutions through July 1, 2018.

[6] Additionally, there have been 16 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[7] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 16 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $122,886.42.  For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

[8] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

In addition to the extensive history of informal resolution, the undersigned has also issued 14 reasoned decisions as of the end of March of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[9]

### i.    Below-median awards limited to past pain and suffering

In six prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards ranged from $60,000.00 to $85,000.00.[10]  These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis or edema. The duration of injury ranged from seven to 21 months and, on average, these petitioners saw between 11 and 12 months of pain.

Significant pain was reported in these cases for up to eight months.  However, in most cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Only the petitioners in *Kim* and *Attig* reported pain at the upper end of the ten-point scale.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery.  Only two (*Attig* and *Marino*) had cortisone injections. Several of these cases (*Knauss*, *Marino*, *Kim* and *Dirksen*) delayed in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

Two of the petitioners (*Marino* and *Desrosiers*) had significant lifestyle factors that contributed to their awards.  In *Marino*, petitioner presented evidence that her SIRVA interfered with her avid tennis hobby.  In *Desrosiers*, petitioner presented

---

[9] An additional case, *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, was removed from the SPU due to the protracted nature of the damages phase of that case.  In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses.  2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).  A separate reasoned ruling addressed the amount awarded. *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[10] These cases are:  *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Attig v. Sec'y Health & Human Servs.*, No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019)(awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Kim v. Sec'y Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dirksen v. Sec'y Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses).

evidence that her pregnancy and childbirth prevented her from immediately seeking full treatment of her injury.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[11]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In four out of five cases, MRI imaging showed possible evidence of partial tearing.[12]  No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 43 days.  Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

---

[11] These cases are: *Cooper v. Sec'y Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Knudson v. Sec'y Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Dobbins v. Sec'y Health & Human Servs.*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses).

[12] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glen humeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus.  In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

### iii.   Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[13]  In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent.  In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.  In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis.  The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded one-year of projected pain and suffering.

## V.   Appropriate Compensation in this SIRVA Case

Neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  The undersigned determines that petitioner had full awareness of her suffering and proceeds to analyze the severity and duration of the injury.

Ms. Kelley was administered the flu vaccine on November 7, 2016, and she experienced immediate pain that increased in severity over the next several weeks.  Ex. 1.  She sought treatment for the pain from an orthopedic specialist only 23 days after the vaccine.  At that time Ms. Kelley reported her pain at 8/10.  She received a cortisone shot which relieved some of the pain and was referred to physical therapy.  Ex. 3 at 3.  Although PT reduced the pain for a period of time, her painful symptoms returned.  Ex. 4 at 10.  An MRI demonstrated an infraspinatus tear, supraspinatus tendinosis, and bursitis, and surgery was recommended.  Ex. 3 at 8, 13.  Ms. Kelley elected to proceed with surgery and underwent a subsequent course of physical therapy which concluded on December 13, 2017.  Ex. 4 at 10-80, Ex. 8 at 1-3.

---

[13] These cases are: *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y Health & Human Servs.*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y Health & Human Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

Although Ms. Kelley initially experienced pain that she described as so severe it would sometimes bring her to tears, after the cortisone injection, she consistently rated her pain to her physician and physical therapists at 0-2/10. Ex. 3 at 44, Ex. 4 at 19, 23, 29-40, 47, 55. The only noted exceptions were the immediate post-surgical visits in which she rated the pain as 3/10. Ex. 3 at 29. When Ms. Kelley did report painful symptoms, it typically occurred at night and affected her sleep causing fatigue. Ex. 3 at 5, 10, Ex. 4 at 14, 17-18.

Ms. Kelley was discharged from physical therapy with a good prognosis, full range of motion of her left shoulder, and strength within normal limits. Ex. 8 at 2. However, it took her 45 sessions of PT over an eight-month period to reach this outcome. Ms. Kelley continued to experience deficits in her strength during this period. *Id*. Her total course of treatment lasted 13 months. Ex. 3 at 1, Ex. 8 at 2.

As noted in section IV(B)(ii) above, the undersigned has awarded compensation for pain and suffering above the median proffered SIRVA award in cases characterized either by a longer duration of injury or by the need for surgical repair. On the whole, the MRI imaging in these cases showed more significant findings. Since petitioner in this case had significant findings on MRI and required surgical repair, she should be awarded an amount above the median.

Petitioner's case is similar to two previously cited surgical cases: *Collado* and *Dobbins*. In both of these cases as well as the instant case, the petitioner sought treatment within a few weeks of the vaccination and was initially treated with a cortisone shot. Subsequently, each petitioner underwent an MRI which revealed significant findings leading to surgery to repair the damage. Finally, each petitioner followed up the surgery with courses of physical therapy leading to an overall satisfactory result. The undersigned awarded $120,000 in pain and suffering damages to *Collado* and $125,000 to *Dobbins*. *See* n. 11, *supra*.

Petitioner in this case argues that she should be awarded more than *Collado* because her course of treatment lasted longer and she had eight times the amount of physical therapy sessions. Pet. Brief at 16. However, the *Collado* petitioner was in treatment for a similar time period (although with less frequency) as this petitioner and she rated her pain at least an 8/10 for a longer duration despite medication and physical therapy.

Regarding *Dobbins*, petitioner argues she suffered more because she had a longer duration of symptoms. Pet. Brief at 14. However, the petitioner in *Dobbins* experienced a post-surgical condition called adhesive capsulitis that caused severe limitations in her range of motion and required many sessions of physical therapy to remedy. Her condition affected her ability to provide care to her terminally ill mother.

In his brief, respondent proposes pain and suffering damages of $85,000.00 and distinguishes *Collado* by noting that, despite surgery, the petitioner still claimed some ongoing pain. Res. Mem. at 5. Respondent cited to four additional cases in support of

his proposal, two of which did not involve surgery. *Id*. at 5-6. First, respondent relies on *Reed v. Sec'y of Health & Human Servs. Id*. at 5. In *Reed*, the undersigned awarded $160,000.00 for pain and suffering to a petitioner who had surgery and nearly two more years of pain and reduced range of motion. Here, petitioner objectively suffered less than the petitioner in *Reed* and thus is not entitled to $160,000.00 in pain and suffering damages. However, the case does not justify an award as low as $85,000.00.

Next, respondent cited to a non-SPU case, *Curri v. Sec'y Health & Human Servs*., No 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). Res. Mem. at 5. The petitioner in *Curri* had surgery and suffered several years thereafter with continued pain. The special master granted her $120,000.00 in past pain and suffering based on similar facts to *Collado* and *Dobbins*. In recognition of the ongoing symptoms, he included a future award of $15,400.00. *Curri* at *6. Like *Reed*, *Curri* does not support respondent's proposed damage award of 85,000.00 for a case requiring surgical repair. Rather, it provides support for an award of $120,000.00 to petitioner.

Finally, respondent relies on the pain and suffering awards of *Desrosiers* ($85,000.00) and *Attig* ($75,000.00) for support in awarding $85,000.00 to Ms. Kelley. However, as previously noted, these cases did not involve surgery (section IV(B)(i), *supra)* and thus do not support respondent's position.

In light of all of the above, and based on the record as a whole, the undersigned finds that $120,000.00 in compensation for past pain and suffering is reasonable and appropriate in this case.

## A. Award for Past Unreimbursed Expenses

Petitioner requests $4,289.05 in past unreimbursable expenses and respondent agrees to this amount. Joint Status Report (ECF 32). Thus, petitioner is awarded $4,289.05 for her past unreimbursable expenses.

## B. Amount of the Award

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. For all the reasons discussed above, the undersigned finds that $120,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering. In addition, the undersigned finds that petitioner is entitled to compensation for $4,289.05 for her past unreimbursed medical expenses. No award is made for lost wages.

## VI.     Conclusion

In light of all of the above, the undersigned awards **petitioner a lump sum payment of $124,289.05,** (representing $120,000.00 for petitioner's actual pain and suffering and $4,289.05 for unreimbursable medical expenses) **in the form of a check payable to petitioner, <u>Lucinda Kelley</u>.** This amount represents compensation for all damages that would be available under §15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[14]

**IT IS SO ORDERED.**

<div style="text-align:center">

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Chief Special Master
</div>

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.